WILLIAM F. MERLE, Plaintiff in Error, *vs.* JOSEPH BEI-
FELD *et al.* Defendants in Error.

*Opinion filed October 24, 1916—Rehearing denied Dec. 21, 1916.*

1. CORPORATIONS—*when equity will interfere to protect inter-
ests of minority stockholders.* Where one corporation owns a ma-
jority of the capital stock in another, so that it controls the latter
corporation, or where one or more individuals own a majority of
the capital stock in two or more corporations and manipulate the
affairs of one corporation for their benefit and to the injury of
minority stockholders in the other corporation, a court of equity
will intervene, at the instance of the minority stockholders in the
latter corporation, to protect their interests.

2. SAME—*when minority stockholder may sue in equity with-
out first making demand on the corporation and its officers.* Where
one stockholder owns the majority of the stock in two corpora-
tions and controls the directors of both, so that credits are im-
properly charged in favor of one against the other, a minority
stockholder in the defrauded corporation has a right to bring suit
in behalf of himself and other stockholders without first making
demand upon the corporation and its officers and directors for re-
dress of his grievances.

3. SAME—*when president of corporation cannot claim interest
on his salary.* The president of a corporation cannot claim inter-
est on his salary which he neglected to draw when due, where the
evidence fails to show any contract for the payment of interest or
that his salary was withheld by the company or that he was re-
quested not to draw it for any period.

4. CONTRACTS—*what contract between an amusement park cor-
poration and concessionaire does not modify the law relating to fix-
tures.* Where a contract between an amusement park company and
another corporation for the erection of a hotel building on the
grounds provides that "all appurtenances and fixtures of a perma-
nent character attached to the building shall be a part of the cost
of the building," the question as to what are to be considered as
appurtenances and fixtures is to be determined by the rules of law
governing the relation of landlord and tenant.

5. SAME—*when place where concessionaire may sell is limited
to particular space.* A contract by which an amusement park com-
pany grants to a hotel corporation a certain concession for the ex-
clusive right of sale of foods, drinks, cigars, cigarettes and tobacco
within the premises occupied by the park company gives the con-

cessionaire the exclusive privileges enumerated within the entire premises but does not give the concessionaire the right to sell anywhere within the premises it may choose, where the contract also grants to the concessionaire a particular space upon which it is to erect its hotel.

6. SAME—*when practical construction by parties is entitled to great weight.* In construing contracts the main object is to ascertain and give effect to the intention, which is to be ascertained from the language of the contract itself and the circumstances and surroundings of the parties at the time it is made, and in case of doubt as to the meaning of the language used the contemporaneous practical construction placed upon the contract by the parties is entitled to great weight.

7. EQUITY—*allowance of costs rests largely in the discretion of the chancellor.* The allowance of costs in a chancery case rests very largely in the discretion of the chancellor, and the courts will interfere only in case of abuse in the exercise of such discretion.

8. INTEREST—*when interest on commissions should be allowed.* If the contract between an amusement park company and a concessionaire clearly provides that the commissions from the sale of certain articles shall be paid to the park company daily, the action of the concessionaire in withholding such commissions and applying them in a manner not authorized by the contract is wrongful, and interest on such commissions should, on accounting, be allowed from the time they became due.

COOKE and DUNN, JJ., dissenting.

WRIT OF ERROR to the Branch "D" Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. E. M. MANGAN, Judge, presiding.

HELMER, MOULTON, WHITMAN & WHITMAN, (ROLAND D. WHITMAN, and LLOYD C. WHITMAN, of counsel,) for plaintiff in error.

FELSENTHAL & WILSON, for defendants in error Joseph Beifeld and the Sherman House Hotel Company.

FARLIN H. BALL, for defendant in error the White City Construction Company.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the court:

William F. Merle, a stockholder of the White City Construction Company, a corporation, (hereinafter called the White City Company,) filed a bill in chancery in the circuit court of Cook county on behalf of himself and all other stockholders of said corporation who might choose to join with him in said suit, against the Sherman House Hotel Company, (hereinafter called the hotel company,) Joseph Beifeld, Morris Beifeld, Eugene V. Beifeld, Frank Behring, Lillian Beifeld, L. A. Dehen, Aaron J. Jones, Samuel J. Kline, Paul D. Howse, Edward B. Grossman, the Chicago Fire Exhibition Company and the White City Construction Company, charging a misappropriation of the corporate funds of said White City Company to his prejudice and asking for an accounting of the funds alleged to have been misappropriated and for other relief. Answers were filed by all of the defendants. A preliminary hearing was had before the court, at which was fixed, in a general way, the rules to govern the accounting, and the cause was referred to a master in chancery to take the evidence and report the same, with his conclusions of law and fact. The master made his report, finding the bill was properly brought and stating an account between the parties up to the time of filing the bill. Exceptions were filed to the master's report, and on the hearing the court entered a decree finding that the proceedings were properly brought and approving the master's report as to certain items allowed and overruling it as to others. From this decree plaintiff in error, and Joseph Beifeld, the hotel company and the Chicago Fire Exhibition Company prayed and were allowed appeals to the Appellate Court for the First District. Plaintiff in error and Joseph Beifeld and the hotel company perfected their appeals to that court. The appeals were consolidated in that court for hearing, and judgment was rendered affirming the

decree of the lower court in part and reversing it in part and remanding the cause for further proceedings in the circuit court. A writ of *certiorari* was allowed by this court and the cause is now in this court pursuant to the mandate of such writ.

The bill was filed in the circuit court of Cook county on January 11, 1908, by plaintiff in error on behalf of himself and all other stockholders and bondholders of the White City Company who might choose to join with him, alleging its organization under the laws of Illinois on August 26, 1904, with a capital stock of $1,000,000, divided into 10,000 shares of the par value of $100 each; that ever since its organization a majority of its capital stock has been owned or controlled by Joseph Beifeld; that while from time to time shares of stock appeared on the books of the company in the name of Lillian Beifeld, Morris Beifeld, Eugene V. Beifeld, Frank Behring, Samuel J. Kline, L. A. Dehen and E. B. Grossman, they were, in fact, either held in the interest of Joseph Beifeld or controlled by him, and that by means of his stock ownership or control he has continually dominated the directors in the conduct of the business of the company; that the hotel company is an Illinois corporation, in which Joseph Beifeld owns and controls substantially all of the capital stock; that Joseph, Morris, Eugene V. and Lillian Beifeld conspired for the purpose of fraudulently depriving the stockholders of the White City Company, including the plaintiff in error, of their rights and interests as such stockholders by converting its funds, profits and property for the benefit of themselves and the hotel company, and in pursuance of such conspiracy have from time to time since August 26, 1904, fraudulently caused and permitted large sums of money to be paid out of the funds of the White City Company to the hotel company, to the Beifelds and other persons unknown to plaintiff in error, in their business and financial transactions with the White City Company, to which sums of money thus allowed, paid out

or credited the parties were not legally entitled, and sets forth specifically a number of the transactions of the hotel company, Joseph and Morris Beifeld and their agents in which it is alleged the White City Company was defrauded and suffered financial loss, which transactions will be referred to later and more in detail in deciding the specific items in controversy between the parties. The bill further sets forth that Joseph Beifeld has in other instances than those specifically enumerated wronged the White City Company by a personal conversion of its funds and by being interested in other corporations or business inimical to the White City Company, and that by reason of the facts set forth a demand upon defendants, or any of them, including the White City Company, for the righting of the alleged wrongs, would have been futile, and concludes with a prayer for an accounting, the appointment of a receiver, and for other relief.

All of the defendants, by their answers, denied the charges of combination and conspiracy alleged in the bill. The answer of the White City Company further averred it was a solvent, going concern; that it objected to any interference with its internal affairs by this suit, and it denied plaintiff in error's right to the relief prayed and averred its willingness to produce its books and records for examination by the court and to abide by any order the court might enter in the premises. The answer of Joseph Beifeld also denied the charges of combination and conspiracy, and further denied that any demand for rectification of the grievances complained of had been made upon him or the corporation or its officers and directors or if made would have been futile, and contained other allegations in respect to the matters charged in the bill which will be hereinafter noted in so far as they are material to be considered at this time. The hotel company adopted the answer of Joseph Beifeld. The answers of the other defendants raised no issue not presented by the answers of the others and require no further

notice at this time, except the statement that they likewise denied all charges of combination and conspiracy made in the bill. Upon the filing of these answers plaintiff in error amended his bill by alleging that certain facts set forth in Joseph Beifeld's answer were additional evidence of his charge against him. Replications were filed to the answers, the answers to the original bill being ordered to stand as answers to the amended bill.

It appears from the pleadings and proofs that the White City project as an amusement park was first brought to the attention of Joseph Beifeld in June, 1904, by Paul D. Howse and Aaron J. Jones, men of experience in the amusement business. At that time Joseph Beifeld was president and principal owner of the hotel company, a corporation which conducted the Hotel Sherman and the College Inn restaurant, in Chicago. He was without experience in the amusement business but became interested in the proposition because he believed it would afford him an opportunity for extending his restaurant business. A lease of ground was taken by these three men at Sixty-third street and South Park avenue. The White City Company was organized in August, 1904, with a capital stock of $1,000,000, and the lease was assigned to it and a bond issue of $500,000 authorized by that corporation to raise money with which to build and equip the park. Joseph Beifeld, Howse, Jones and E. C. Boyce, the architect who drew the plans and supervised the construction of the park, took $300,000 of the capital stock for promoting the enterprise. The remainder of the capital stock was to be used in selling the bonds,— $200,000 as a commission for selling and $500,000 to be given as a bonus with the sale of the bonds. Joseph Beifeld purchased $235,000 worth of the bonds and sold $125,000 more to his friends, and $50,000 worth was otherwise disposed of. Plaintiff in error became interested in the enterprise in the fall of 1904, at which time he purchased $1000 worth of bonds, with which he received $1000 worth of

stock. He has since purchased other stock and bonds to such an amount that at the time of filing the bill he owned practically one-seventh of the entire capital stock of the White City Company. He received no bonus with the purchase of any of the stock or bonds except the first $1000 worth. He was also interested in several concession contracts, among which was that of the Chicago Fire Exhibition Company, one of the defendants to his bill.

The White City was built and opened to the public on May 27, 1905. Its construction involved an expenditure of more than $800,000, aside from the amount expended by the hotel company in constructing the College Inn building, otherwise known as the Casino, pursuant to the terms of the concession contract granting to it the restaurant privileges of the premises. This contract is dated November 9, 1904, and hereafter will be referred to as contract "A." Its provisions material to be noted at this time are substantially as follows:

*First*—The company (the White City Company) leased to the concessionaire (the hotel company) the concession known as the White City concession No. 1, for the exclusive right of sale of foods, drinks, cigars, cigarettes and tobacco within the premises occupied by the company as lessee of a tract of land situated at the corner of Sixty-third street and Park avenue, upon which the company is constructing the White City.

*Second*—"And for the purpose aforesaid" the company granted to the concessionaire the use of space approximately 100 by 200 feet on the east side of said grounds, on the north end thereof, the exact space being shown on the ground plan drawn by Edward C. Boyce, adopted by the company and issued by Joseph Beifeld, president.

*Third*—Said concessionaire is hereby given the right to and will construct upon said space so allotted to him, a building or buildings at a minimum cost of $25,000, the same to be erected at his own cost and expense, except that

the company will install and pay for electric wiring and electric fixtures necessary properly to light said building or buildings. Until said building or buildings shall have become the property of said company, as hereinafter provided, the concessionaire will pay all the expense connected with the repair and maintenance thereof and of the grounds whereon the same are situated.

*Fifth*—For the purpose of determining the cost of the buildings, the concessionaire to furnish, after the completion of the same, full statement of the cost, together with amounts expended by him for all appurtenances and fixtures of a permanent character attached to the building, all of which shall be a part of the cost of the building. In determining the cost no account shall be taken of movable fixtures, as tables and chairs, nor of any linen, silver or table or kitchen utensils.

*Ninth*—The concessionaire covenants and agrees to pay to said company as compensation for this grant, concession and license, in lieu of all other rents or charges, twenty-five per cent of the gross receipts from the sales of drinks and ten per cent of the gross receipts from the sales of cigars, cigarettes and tobaccos, but shall not pay any commission or percentage on the sale or sales of eatables.

*Tenth*—The concessionaire shall not pay to the company any portion of the twenty-five per cent and the ten per cent of the gross receipts but shall retain the same until such per cent shall equal the total original cost of the building or buildings, appurtenances and equipments, as shown by the statement which shall be furnished to the company by the concessionaire, and until the concessionaire shall be reimbursed for all outlays in maintaining buildings, appurtenances and moneys expended for insurance thereon. When the total amount of retained percentages by the concessionaire shall equal the cost of the buildings, appurtenances and cost of maintenance the buildings shall become the property of the company, and the concessionaire shall then execute

and deliver to the company any conveyance which may be necessary. Upon receiving due compensation the concessionaire shall assign to the company all insurance then upon the buildings and equipment. Thereafter the concessionaire shall pay twenty-five per cent of the gross receipts from the sales of drinks and ten per cent of the gross receipts from the sale of cigars, cigarettes and tobacco, in the manner hereinafter provided. Thereafter the company shall be liable for and shall pay the cost of making repairs to the buildings and cost or charges of maintenance, excepting for water and cost of lighting and heating.

*Twelfth*—The concessionaire shall install and keep for sale such soft drinks, being drinks other than spirituous and malt liquors, as the company may from time to time in writing request. In case of failure to do so after five days' notice the concessionaire shall forfeit the exclusive rights and privileges granted by this contract.

On December 10, 1904, the White City granted to the hotel company a further concession for the exclusive sale on its premises of candy, peanuts, pop-corn, cracker-jack and fruit of all kinds, except that sold through slot machines, for a period of ten years, together with two spaces, eight feet by ten feet each, in a building to be erected by the company, also two center booths to be selected by the company, the concessionaire to pay daily twenty-five per cent of the gross receipts, from all sources, from the operation or maintenance of the concession. This contract will hereinafter be referred to as contract "B." The manner in which these contracts were interpreted and carried out by the hotel company and the White City gives rise to many of the charges in the bill upon which plaintiff in error bases his right to maintain this suit.

Pursuant to the provisions of contract "A" the hotel company constructed the College Inn building or Casino at a cost of approximately $113,000, and other buildings, which amounts were charged to the construction account,

and rendered to the White City Company a statement for approximately $121,000 as the cost of the same. This statement in some instances showed merely a number of persons, firms and companies, with sums set opposite their names, with nothing to indicate the character of goods or materials purchased for which the charges were made in the account. It also included, in addition to the items for the cost of the construction of the building proper, items for bar fixtures, refrigerators, motors, filter, cooking range, and the like. It also included an item of $6500 for the construction of a building called the Terrace Tavern and $250 for a platform for a merry-go-round. In addition to these amounts the White City Company was charged for sundry items for alterations of the bar, ice-box, etc., and for curtains and picture frames, and for other items for which no vouchers were produced, in the aggregate amounting to approximately $1716.28, and for the cost of constructing booths at cigar and ice cream stands, a booth for drinking water, and for labor and paint on such booths, amounting to $1713.15. It further appears that the White City Company was charged with $546 in 1905 and $600 in 1907 for painting the chairs and tables used in the College Inn, with $2000 for a band stand constructed in the plaza, and $3000 for the cost of a tunnel from the College Inn building to the band stand to facilitate the sale of drinks at the latter place, and was presented with a bill for alterations made in the College Inn building in 1906 and 1907 by the hotel company to the amount of $24,747.11, without any action taken by the White City Company authorizing such alterations, the bill being presented in the same manner that the hotel company and Joseph Beifeld were in the habit of presenting other bills against the White City Company for entry on its books as a charge against it, but it was not passed upon by the officers of the White City Company or allowed because of the suit threatened by plaintiff in error. A rebate of $2000 was allowed to the hotel company on account of the

electric lights used in the College Inn building, no rebate of any such character being allowed to any other concessionaire on the premises, and also the sum of fifty cents per week on all cash registers used by the hotel company and the Midland Machine Company, which latter was controlled by Aaron J. Jones. The commissions on champagnes under contract "A" were changed from twenty-five per cent to ten per cent, and no credit was allowed for the champagne that was served at banquets. No commissions were paid on milk sold by the glass, or on milk sold with sandwiches on Saturdays and Sundays from a booth known as the Wooden Cow. During the season of 1905 the hotel company sold orangeade and water to the amount of $639.19, and ice cream and ice cream cones and ice cream soda water at various places on the grounds other than at the College Inn building, on which no commissions were paid to the White City Company after the first five weeks of the park season. Confetti also was sold by the hotel company throughout the premises during the latter part of the seasons of 1905 and 1906 and no commissions were paid on the same to the White City Company. It further appears that since January, 1907, the hotel company has occupied space under the ball room as a dairy lunch room, for which the White City Company receives nothing by way of rent. This ball room is located on property outside of the restaurant concession and its annual rental value is estimated at $2500. During the years 1905, 1906 and 1907 the hotel company also printed advertisements on the menu cards used in the College Inn and on musical programs used on the plaza, from which it derived a revenue of some $14,765.90, upon which no commissions were paid to the White City Company, which published a magazine in which it sold advertising space but was unable to procure the advertisements of those advertising on the menu cards and musical programs by reason of such advertisements there. One of the concessionaires, the Chicago Fire

Exhibition Company, having a capital stock of $80,000, controlled by Morris Beifeld, in which the wife of Joseph Beifeld owns $5000 and plaintiff in error $2000 of the capital stock, is indebted to the White City Company to the amount of $4200 and no effort was made to collect the same. Joseph Beifeld caused a check to be drawn in his favor for $550 for interest on his salary of $10,000 per year, which he omitted to draw during the first eleven months of his term of office, there being no agreement to pay interest on such account and no request made on the part of the White City Company that he should not draw his salary as it accrued. It further appears that all commissions due under contract "B" were not paid to the White City Company daily in cash, as provided by that contract, but were credited to it on the construction account under contract "A," which by the terms of the contract were to be paid for by commissions derived under that contract. The foregoing are the principal items in dispute as set out in the bill of complaint.

The wrongs complained of are primarily against the corporation and ordinarily it would be the proper party to bring this action. For this reason defendants in error insist that complainant has no standing in a court of equity. Their contention is that the acts complained of relate to the internal management and affairs of the corporation, of which a court of equity has no jurisdiction in the absence of fraud, and that the evidence fails to show fraud on the part of Joseph Beifeld and the hotel company; and that, in any event, before plaintiff in error can institute and conduct this suit in his own name he must first show that he exhausted all reasonable means within his reach to obtain redress from the corporation itself for the grievances of which he complains or show such a state of facts as makes it clear that a demand for redress of the grievances complained of would have been futile, and that the evidence in this case fails to show either such demand, or that such demand, if

made, would have been futile. Plaintiff in error insists he has met these·requirements of the law by his evidence.

The evidence shows that Joseph Beifeld is the president and director of the hotel company, and, in fact, proprietor of that institution. On the witness stand he refused to disclose the extent of his holdings in that company. He also owns or controls a majority of the stock of the White City Company, and thereby is enabled to control the election of its directors and their actions after being elected. That he has done so in this instance there can be but little doubt under the facts and circumstances disclosed by the record. Whenever differences of opinion arose in regard to the matters involved, the majority of the directors of the White City Company adopted his views, and as a party to this suit the White City Company itself has taken only a passive interest in the proceeding, although it is one brought for its particular benefit and for the purpose of procuring the construction of contracts in which it is vitally interested. Under these circumstances there can be but little question but that had a demand been made upon it the request would have been refused, or if granted and a suit instituted the same would have been under the direction and control of a board of directors favorably inclined to Beifeld, controlled by him and disposed to accede to his wishes in the matter. That a suit of that character would not afford to the aggrieved minority stockholders the measure of relief contemplated by suits of this character seems clear.

Joseph Beifeld, through his ownership of a majority of the stock in the hotel company and the White City Company, in effect controls both corporations and is able to dictate the policy and control the action of each corporation for the benefit of the one or the other corporation, as he sees fit or as may best further his personal interests. His power of control and direction of the action of the two corporations places him, in effect, in the shoes of each corporation and gives him the power to dictate the exercise of

all of the powers which both corporations could exercise.
The situation presented is no different, except in form, from
that where one corporation owns a majority of the stock of
another. The White City Company, therefore, by reason of
Beifeld's ownership of a majority of its capital stock, is
as completely under the domination and control of the hotel
company as if the majority of its stock were, in fact, owned
and controlled by the latter company. Under these circum-
stances we think a court of chancery properly took jurisdic-
tion of this suit. The rule is well settled that where one
corporation owns a majority of the capital stock of another,
so that it controls the latter corporation, or where one or
more individuals own a majority of the capital stock in two
or more corporations and manipulate the affairs of one for
their benefit and to the injury of the minority stockholders
in the other corporation, a court of equity will intervene,
at the instance of the minority stockholders in the latter cor-
poration, to protect their interests in the premises. 2 Cook
on Corporations, (6th ed.) sec. 662; 10 Cyc. 979; Hale
on Corporations, sec. 123; *Gilman, Clinton and Springfield
Railroad Co.* v. *Kelly,* 77 Ill. 426; *Klein* v. *Independent
Brewing Ass'n,* 231 id. 594; *Green* v. *Hedenberg,* 159 id.
489; *City of Chicago* v. *Cameron,* 120 id. 447.

That in many instances improper charges were made
against the White City Company and commissions not paid
to it which it was entitled to, and charges paid for which
it was not liable to Joseph Beifeld or the hotel company,
on his order or with his knowledge, cannot be seriously
questioned. Several such items wrongfully charged against
the White City Company are shown by the record, amount-
ing in the aggregate to $7587.29, which were either admit-
ted on the trial or disallowed by the court and their dis-
allowance acquiesced in by defendants in error. In other
instances Beifeld has vigorously resisted crediting the White
City Company with items for which it should have received
credit, so that, considering all the facts and circumstances

disclosed by the record, we think the court did not err in holding that plaintiff in error has a right to bring this suit in behalf of himself and other stockholders without first making a demand upon the corporation and its officers and directors for redress of the grievances of which he complains in his bill.

It now remains to consider the several items in respect to which there is still a controversy between the parties. This involves a construction of contracts "A" and "B," and a determination (1) of items properly chargeable to the White City Company on the construction account, and (2) those on which it should be paid a commission under the concession contracts.

Among the first items complained of is the cost of bar fixtures, refrigerator, filter, motor, belting, cooking range and kitchen utensils, awnings, and like articles, for which the White City Company was charged as a part of the cost of the construction of the Casino under contract "A." The plaintiff in error contends that these items are not appurtenances or fixtures of a permanent character attached to the building, under the rule of law ordinarily applicable between landlord and tenant; also that the evidence shows they could easily be removed by the hotel company, that it exercised ownership over them, and that they are, in fact, trade fixtures, which cannot properly be regarded as the property of the White City Company, as owner of the building. Defendants in error, while they admit the rule of law, insist that it was the intention of the parties, as shown by the contract, that the building should be so equipped that the hotel company might enter and carry on a restaurant and saloon therein without furnishing anything other than movable fixtures, such as tables, chairs, linen, silver, tableware and kitchen utensils. This contention is based upon the following language of the fifth paragraph of the contract, and upon the fact, as they insist, that the White City Company occupies the same position as the owner of prop-

erty who has constructed a building and placed such fixtures and appurtenances therein for his own use: "For the purpose of determining the cost of the buildings, concessionaire to furnish, as soon after the completion of the same, full statement of cost, together with amounts expended by him for all appurtenances and fixtures of a permanent character attached to said building or buildings, all of which shall be considered as a portion of the cost of said building or buildings. In determining the cost of the same no account shall be taken of movable fixtures, such as tables and chairs, nor of any linen, silver or tableware or kitchen utensils."

As we read the contract it does not lay down a different rule from that contended for by plaintiff in error or show an intention to ignore the rule of law ordinarily applicable where the relation of landlord and tenant exists. While it is stated that such movable fixtures as tables and chairs, linen, silver, tableware and kitchen utensils are not to be considered in determining the cost of the building, it is also stated that nothing but "appurtenances and fixtures of a permanent character attached to the building" shall be considered as a part of the cost of its construction. The contract, therefore, is merely declaratory of the law on this subject, and the items properly chargeable thereunder must be determined in accordance with the well established rule of law where the relation of landlord and tenant exists. On the hearing before the court plaintiff in error introduced considerable evidence bearing on the question as to whether or not these items charged against the White City Company are of a permanent character within the rule above announced, but the court held such evidence immaterial, so that it was not, perhaps, as vigorously contested in the court below by defendants in error as it might otherwise have been but for such holding, for which reason we think this question should be left open for the taking of further evidence under the rule of law above announced. In most instances the items under consideration are but trade fixtures,

275 — 39

and of such a character that, even though attached to the building, they remain the property of the lessee and removable as such. Upon a consideration of the evidence now in the record we are inclined to hold that none of the items allowed under this head are appurtenances or fixtures of a permanent character attached to the building so as to be chargeable as such against the White City Company.

Other items claimed to have been improperly charged to the White City Company are the Terrace Tavern building, extra booths, (being booths other than those provided for in contract "B,") a band stand, and a tunnel from the College Inn building leading to the band stand. The Terrace Tavern was not built on the space granted to the hotel company in contract "A" but was located at a considerable distance from the College Inn building, on the premises of the White City Company. It was used by the hotel company as a place wherein to serve ice cream, ice cream soda and other soft drinks. It neither paid to the White City Company any rent for the space occupied nor commissions in lieu of rent for the use of the space. The evidence shows that while no written agreement was made and no formal action taken by the directors of the White City Company in the matter, Howse and Joseph Beifeld agreed informally that the hotel company should construct the Terrace Tavern building, and the same was constructed by the hotel company and the cost of construction charged to the White City Company. Howse was a man of extensive experience in the amusement park business and had the active charge and management of the building of the White City. He also supervised the letting of most of the concessions, and in most instances determined the rate of commissions the concessionaires should pay. The evidence further shows that Howse, Beifeld and Jones composed the executive committee created by the board of directors of the White City Company, which executive committee was vested with authority by the board of directors to perform any and all

acts in their judgment necessary to be done in the interim of the regular meetings of the board; that frequently informal meetings of this committee and meetings of other directors were held, at which matters pertaining to the White City Company and its affairs were discussed and measures decided upon and carried out without any record of such meetings being made or kept in the corporate records; that at such times matters were usually discussed on their merits, and the views of Howse were frequently adopted because of his experience in the amusement park business. There is evidence also tending to show that the Terrace Tavern was erected at the place it was situated at his suggestion, as it offered a desirable location for supplying the public with eating and drinking facilities, and no other buildings in that part of the park were devoted to that purpose. It further appears that with the exception of the College Inn building the buildings in which the other concessions were carried on were constructed by the White City Company. Under the evidence the Terrace Tavern was an improvement which might properly have been constructed by the White City Company without any formal action by its board of directors. The cost of its construction and subsequent removal was therefore properly charged to the White City Company. We are also of the opinion that it was not included within the provisions of the contract with the hotel company, and that the latter should pay a reasonable rental or commission such as other concessionaires would have paid for it use. The same reasoning applies also to the extra booths claimed to have been constructed at the expense of the White City Company without formal authority. The decree of the lower court charging these items to the White City Company will therefore be affirmed. As to the items aggregating $355.92 in the Terrace Tavern bill, including a $250 charge for a platform for a merry-go-round, defendants in error do not contest the impropriety of these charges and

make no objection to the ruling of the master in disallowing them. They require no further consideration.

Other items complained of are $2000 for the cost of the construction of a band stand in the plaza and $3000 for the construction of a tunnel leading from it to the College Inn building. The object of this tunnel was to facilitate the sale of drinks at the former place. The band stand item was not passed upon by the master because the expenditure was made after the filing of the bill and he was of the opinion it was not properly before him. As we are of the opinion that it would be one of the contested items upon a re-reference and further hearing in the cause, we think it proper to consider it at this time. That it would have been proper for the White City Company to have constructed a band stand in which it might furnish music for the general amusement of the patrons seems to us cannot be questioned. If so, its construction was properly charged to the White City Company. As to the charge for the tunnel, its object was to facilitate the sale of drinks at the band stand, from which the White City Company derived a commission from the hotel company. It was apparently as much for the benefit of the White City Company as the hotel company. That the officers of the White City Company had the power and authority to construct such additional buildings and conveniences as it deemed proper for the convenience of its patrons and the supplying of their wants seems to us beyond question. That subsequent events may have demonstrated that such expenditure was unwise, in that the money used for such purpose might better have been devoted to some other purpose, does not militate against the propriety of such charge or the authority of its officers to make such expenditure in the first instance or their good faith in making the same. Tested by the same rule applied to the items of the Terrace Tavern and extra booths, we think these items were proper charges against the White City Company.

Another item complained of is the allowance of a salary of $100 per week to Morris Beifeld as superintendent of construction of the College Inn building, which is claimed to have been from $65 to $70 per week in excess of that usually paid for such services; an item of $550 to Joseph Beifeld as interest on his salary which he neglected to draw during the first eleven months of his term as president of the company; an item of $546 in 1905 and of $600 in 1907 for painting the chairs and tables used in the College Inn building; and an item of $40.95 claimed to have been paid out by the hotel company to its patrons by way of damages to their clothing from soft paint on these chairs and tables. While the salary paid to Morris Beifeld seems high under what the evidence shows was usually paid for such services, still there is nothing in the evidence to show the exact nature of the work performed by him in that capacity or that the salary paid him for such work was grossly excessive for the character of the work performed by him and his experience in work of that nature. While it is true that he was at first paid a salary of but $25 per week, which was soon raised to $100 per week, there is nothing in the evidence to show that such increase in salary was not based upon the actual value of his services rendered in such capacity or that there was any fraud in so doing. The evidence does show that he came from New York City for the purpose of doing this particular work. It not infrequently happens that one or more men are employed at salaries largely in excess of those usually paid for work of like character, and that the transaction is not only unquestioned, but is, on the other hand, deemed a profitable one under the circumstances. In the present state of the record we are unable to say that the price paid to Morris Beifeld was so grossly excessive, under the circumstances, as to indicate that in giving him this increase in salary the directors and officers of the White City Company were actuated by fraud, and in the absence of such showing, the contract be-

ing one within the discretion of its officers and which they had a right to make, we hold there was no impropriety in making such charge against the White City Company. As to the interest allowed to Joseph Beifeld on his salary as president of the White City Company, the evidence shows that a salary of $10,000 per year was voted to him for the year 1906, to be paid, if desired, in monthly installments, and that his salary was not drawn until November 1, 1907, and that at his own direction he was allowed interest upon the same for eleven months at the rate of six per cent per annum. The evidence fails to show any contract for the payment of interest or that his salary was withheld by the company, or, in fact, that he was even requested not to draw his salary in monthly installments if he saw fit. His action in the premises was purely voluntary and created no obligation upon the part of the White City Company to pay him interest on such salary. The item was improperly charged against the White City Company and should have been disallowed. As to the items of painting chairs and tables in the White City and damages to clothing from such paint, those articles constituted a part of the movable fixtures of the College Inn, which under the provisions of contract "A" were unquestionably the property of the hotel company, and as such it should have borne these charges.

Other items complained of are the allowance of a rebate to the hotel company of $2000 on its electric light bill and of fifty cents per week on cash registers. Similar rebates were not allowed to other concessionaires except the Midland Machine Company, in which Jones was interested, which also was allowed a rebate of fifty cents per week on the cash registers used by it. The only reason urged for the allowance of the electric light rebate is that the light at the College Inn helped to light the White City grounds. The same would be true as to every other concession which used lights. The contract with the hotel company specifically provided that the White City Company should furnish

it with "sufficient electric light to properly light the build-
ings and grounds" at a profit of one-half cent per kilowat
to the White City Company, and we find nothing in the
evidence to warrant a deviation from such contract. As to
the rebate on cash registers, we find nothing in the evidence
to warrant that either, and neither item should have been
allowed as a credit to the hotel company.

It further appears that during the seasons of 1906 and
1907 alterations were made in the College Inn building to
the amount of $24,747 or more. The alterations were not
in the nature of repairs. When the matter first came up,
plaintiff in error protested against it and threatened to en-
join payment of the bill if made at the expense of the
White City Company. Thereupon it was agreed such ex-
pense should be borne by the hotel company. A bill for
the same was, however, presented to the White City Com-
pany in the same manner as other bills were presented by
the hotel company and Beifeld, as a charge against the
White City Company. Before this charge was passed upon
this action was instituted, and it was conceded on the hear-
ing that such item was not properly chargeable against the
White City Company. The item therefore requires no fur-
ther consideration here, other than to mention it as one
of the items over which this controversy arose and which
both Beifeld and the hotel company insisted in their answers
should be charged to the White City Company.

It remains to consider the items for which the plaintiff
in error claims the White City Company did not receive
proper credits from the hotel company. This involves a
construction of contract "A" and the extent of the privi-
leges granted by that contract, as well as the items for
which the White City Company should be paid a commis-
sion under such contract.

Plaintiff in error contends that while the contract grants
the hotel company the exclusive right of sale of the com-
modities properly coming within the terms of the contract,

the exercise of the rights and privileges granted is limited
to the space mentioned in that contract. Defendants in er-
ror contend that the hotel company may exercise its rights,
under such contract, at any place on the premises of the
White City Company. We think the construction contended
for by plaintiff in error is the proper one. While the con-
tract grants to the hotel company the "exclusive right of
sale" of the articles mentioned therein, it also fixes and de-
fines the space upon which such right may be exercised as
a "space approximately 100 by 200 feet on the east side of
said grounds so leased to said company and at the north
end thereof, the *exact space* being shown and designated on
the general ground plans drawn by Edward C. Boyce and
heretofore adopted by said company [the White City Com-
pany] and initialed by said Joseph Beifeld, as president of
said company." In this respect the terms of the contract
are similar to those in contracts made with other conces-
sionaires, such as those with Morris Beifeld for a reproduc-
tion of the Chicago Fire, the Mystic Maze and Pharaoh's
Daughter. The Chicago Fire concession contract describes
the space to be used as a "space leased 100 by 100 feet at
the north end of the White City, with entrance;" the Mys-
tic Maze as "the space occupied during the season of 1906
by the show known as Jeweli Manikins;" the Pharaoh's
Daughter as "the space to be used being the space occupied
during the season of 1905 and 1906 for the Johnstown
Flood." That the privileges granted by the latter conces-
sion contracts are confined to the space specified in the con-
tracts we believe cannot be seriously questioned. If so, why
does not the same rule apply to the hotel company contract?
The language of the contracts in this respect is similar, and
we find no other language in contract "A" which would
warrant us in placing any different construction upon such
language in that contract and similar language used in the
other concession contracts. Its language is equally as spe-
cific as that of the other concession contracts, as, after de-

scribing the land leased, it further states the "exact space" is shown on the ground plans of the company. That space, as we understand the record, is the space now occupied by the College Inn building. Under such circumstances we can hardly construe the words "exact space" as meaning anywhere on the White City Company's premises, and we do not so construe the words.

Complaint is further made that no commissions were paid on wines served at the banquets; on milk sold by the glass when not served as a part of a meal; on ice cream, ice cream cones, soda water, orangeade and a soft drink known as "natural ozone;" on confetti; and on candy called "fluff-fluff," sold on the premises by the hotel company. As to the wines, during the season of 1905 a number of banquets were held at the White City at which wine was served as part of a meal, on which no commissions were paid by the hotel company. At the subsequent banquets held during the years 1906 and 1907 the White City Company was credited with a commission of ten per cent of the cost price of the wines served at such banquets. Plaintiff in error contends the contract price of twenty-five per cent of the gross receipts from all drinks should govern on all wines served, either as a part of a meal or otherwise. Defendants in error contend that banquets were often served at a very low price for advertising purposes; that there was no profit in such banquets, and therefore the hotel company should not be required to pay any commissions on wines served at such banquets during the year 1905; and further, that a modification was made of the contract by which the hotel company was only required to pay a commission of ten per cent on the sale of all wines instead of twenty-five per cent, as originally provided in the contract. No provision was made in the contract exempting wines or other drinks served at banquets from the provisions of the contract. Neither is it claimed that any modification of the contract, based upon a valuable consideration, was subse-

quently made. In the absence of such showing the contract as originally made must govern. For this reason we are of the opinion that the White City Company should be allowed the commissions provided in the contract on all sales of liquors, including those served at banquets.

As to the claimed modification of the contract, defendants in error do not contend but that champagne and wines were included within the provisions of the contract as originally drawn, nor do they claim that any fraud or imposition was practiced upon the hotel company in the making of the contract or that it was not fairly made and entered into between the parties. The only claim advanced is that the hotel company made a mistake in agreeing to pay such a high rate of commissions for the privilege granted. The same argument would probably be advanced by every concessionaire if by so doing he could have his rate of commissions reduced. Such an argument does not commend itself to this court as good ground for altering a contract fairly made and entered into, in the absence of fraud or imposition in the making of the contract. There is no record evidence of any such change in the contract, and there is a very serious dispute in the evidence as to whether such matter was ever taken up with the board of directors and considered by them, either formally or informally. In view of the fact that Beifeld practically owned and controlled both corporations; that the contract as originally made seems to have been fairly made, and there is no evidence in the record to show that any mistake was made in the contract except that it is now claimed the hotel company is paying a higher rate of commissions on such commodities than it should have been required to pay, or that any fraud or imposition was practiced upon it in making such contract, and no affirmative relief is sought by it in that respect from the White City Company by a cross-bill, we hold that the hotel company should pay the White City Company the commissions at the rate of twenty-five per cent upon the

gross receipts of all such wines sold on the premises while contract "A" is in force between the parties.

As to the milk sold by the glass on which no commissions were paid, besides what was sold in the College Inn building, the hotel company sold milk by the glass during the years 1906 and 1907 at a booth known as the Wooden Cow, on space not covered by the grant in contract "A." This milk was not sold as a part of a meal or with other eatables except on Saturdays and Sundays, when it was served with sandwiches sold at the same booth a short distance from where the milk was sold. Defendants in error contend the milk thus sold was an eatable within the provisions of contract "A," and therefore exempt from payment of any commissions under the terms of that contract. As we construe the contract it is not necessary to determine whether or not the milk so sold is an eatable within the purview of such contract, for the reason it was sold at a different place from that granted by the provisions of such contract and in a booth constructed and furnished by the White City Company, for which it was entitled to receive a reasonable rent or commissions on sales made therein in lieu of such rent. The trial and Appellate Courts both held that the hotel company should pay a commission of twenty-five per cent on all sales made at such place except where the milk was sold with sandwiches. We think, in view of the fact that the hotel company had no right, by virtue of its contract, to sell eatables at such place without paying a reasonable rental for the space occupied for such purpose, that it should have been required to pay a commission of twenty-five per cent on all milk sales made at such booth.

As to water, orangeade, natural ozone and sundry candy sales, such as fluff-fluff, we think those articles are fully covered by the provisions of contracts "A" and "B" that the hotel company should be required to account to the White City Company for its commissions on such sales. Contract "A" covers the sale of soft drinks and fixes a rate

of commissions to be paid thereon, and contract "B" for that of the candy.

The confetti sold during the last few days of the seasons of 1905 and 1906 was not covered by the terms of any contract. The hotel company has voluntarily credited to the White City Company a commission of twenty-five per cent of the gross receipts from such sales. The plaintiff in error contends that that was not a reasonable commission. The evidence shows that by the terms of most contracts with concessionaires they were only required to pay a commission of twenty-five per cent on their gross receipts for the concessions granted. Since 1906 the sale of confetti has been handled by the White City Company. Under the circumstances we think the twenty-five per cent commission allowed and paid by the hotel company to the White City Company is sufficient, but that it should have been paid to the White City Company instead of credited on the construction account.

The evidence shows that during the seasons of 1905, 1906 and 1907 ice cream by the dish, in cones and in ice cream sodas was sold by the hotel company at various places on the White City grounds on which no commissions were paid or allowed to the White City Company. Defendants in error contend that ice cream in these various forms was an eatable, and therefore exempt from paying any commissions under the terms of contract "A." The evidence further shows that during the first part of the season of 1905 the hotel company sub-let the privilege of selling ice cream in its various forms, other than in the College Inn building, to other parties, from whom it received a commission of fifty per cent on the gross receipts of all such sales, and that it credited the White City Company with one-half of the amount received from such sub-lessees. The evidence of Howse shows that ice cream, when served otherwise than as a part of a meal, is never included within the terms of a contract granting to a concessionaire the exclusive right

of the sale of eatables in amusement parks. The contract was also so construed, in the first instance, by the parties to it. In construing contracts the main thing is to ascertain and give effect to the intention of the parties. This intention is to be ascertained from the language of the contract itself and the circumstances and surroundings of the parties at the time it is made. In case of doubt as to the meaning of the language used, the contemporaneous construction placed upon it by the parties is entitled to great weight. It is apparent from the provisions of contract "A" that from the first it was the intention of the parties that Beifeld or the hotel company should have the exclusive right of conducting a restaurant on said premises and selling therein all such articles, excepting liquors and soft drinks, as are usually and customarily served as parts of a meal, without paying any commissions on such sales to the White City Company. This was one of the things which induced Beifeld to enter into the White City project; but we do not think it was the intention of the parties that he might exercise that privilege wherever he chose on the grounds or at any other place than that mentioned in contract "A," or that it was the intention of the parties that sales of such articles as ice cream in its various forms, when not served as part of a meal in the College Inn building, should be made without paying a commission on such sales to the White City Company. This was the construction placed on the contract by the parties themselves when these articles were sold through the sub-lessees, and, we think, is the proper construction of the contract. We are therefore of the opinion that the White City Company should have been paid a commission of twenty-five per cent upon all sales of ice cream, in its various forms, on the grounds, at places other than the College Inn.

Another item is the dairy lunch. Prior to the year 1907 a lunch was served in what was known as the balcony of the College Inn building. In January, 1907, the directors

adopted a resolution granting the hotel company the right to use space under the ball room for the purpose of conducting a lunch room. The resolution made no provision for the payment of rent for this place. Since the opening of the season of 1907 the hotel company has conducted a lunch there known as a dairy lunch, but has paid the White City Company no rent for the use of this space or commissions on the sales made thereat in lieu of rent. The evidence shows a fair and reasonable rent for such space would be from $2000 to $2500 per year. Defendants in error contend that the conducting of a dairy lunch by the hotel company was within the purview of the terms of contract "A," and therefore it was not required to pay any commissions upon sales of such lunches; also that there was an indirect benefit to the White City Company by reason of its furnishing the patrons with a quicker and cheaper lunch than they could otherwise have secured at the College Inn building, by reason of which its patronage would be considerably increased. While this may all be true, we do not think it offers sufficient ground for allowing the hotel company to occupy valuable space in the White City without paying any rent, or commissions in lieu of rent, for the use of such space. Every amusement added to the park might be said to have resulted in an indirect benefit to the White City as tending to increase its patronage. As we have already construed contract "A," it applied merely to the space granted to the hotel company by that contract, and would not, and does not, cover the sale of eatables at other places on the grounds except to prohibit other persons or concessionaires from making such sales on the White City premises. Where the hotel company used the property of the White City Company in making such sales we think it should be required to account to the White City Company for the reasonable rental value of such space or property used by it, based on the usual and customary commissions paid for such privilege.

Complaint is also made that no commissions were paid for the advertisements on the menu cards used in the College Inn and on musical programs distributed at the plaza. The advertising on menu cards and musical programs was not covered by the express terms of any contract between the hotel company and the White City Company. This much is admitted in the answer of Joseph Beifeld and the hotel company. It further appears that during the years 1905, 1906 and 1907 the hotel company derived a revenue of something like $14,765 from this source. During the first year the White City Company published a. magazine called the *White City Magazine,* for which it solicited advertisements from the various business houses in Chicago. This magazine was conducted at a loss to the White City Company. Beifeld, as president of the White City Company, employed the solicitor of advertising for the magazine and instructed him not to call upon the business houses on South Water street from whom the hotel company purchased supplies, for the reason that he wanted those houses to place their advertisements on the menu cards of the hotel company. It further appears that several business houses which had taken advertising contracts with the White City Company's magazine canceled their advertisements with it for the reason that they did not care to carry advertisements in both the White City Company's magazine and on the menu cards and musical programs. The menu cards were necessarily furnished by the hotel company and were an expense borne by it in connection with its restaurant and eating concessions. Such advertisements as it was able to get by printing the same on the menus were a mere incident, for which it should not be made to account to the White City Company. The musical programs contained advertisements and the lists of the selections played from day to day by the band employed by the White City Company, which gave concerts in the plaza of the White City. If the advertising on these programs was of value the White City Company

should have received the benefit therefrom, and its officers should not have turned over such a valuable concession to the hotel company for nothing. We think that the circuit court and Appellate Court rightly held that the White City Company was entitled to twenty-five per cent of the gross amount received from advertising on the musical programs.

The evidence shows that the commissions derived from the sale of candy, peanuts and popcorn under contract "B" were not paid daily to the White City Company in accordance with the terms of that contract, but, instead, were credited to it on the construction account. Plaintiff in error contends the White City Company is entitled to interest on such amounts so wrongfully credited to it upon the White City construction account from the time they should have been paid in cash to the White City Company. By the terms of contract "A" the hotel company was to be reimbursed for the expense of constructing the College Inn building entirely out of the commissions due the White City Company on the sale of drinks under that contract. Contract "B" was entered into after contract "A" was made, and specifically provided for the daily payment of the commissions due under that contract. The commissions due under contract "B" were wrongfully applied to the construction account of the hotel company. At that time the White City Company was paying interest at the rate of six per cent upon an outstanding bonded indebtedness of $300,000. The action of the hotel company in withholding the money due under contract "B" was wrongful, and we think it should be required to pay interest on such sums wrongfully applied on the construction account, at the legal rate of interest, from the time the evidence shows such funds were received and should have been turned over to the White City Company.

Another item complained of is the alleged indebtedness from the Chicago Fire Exhibition Company to the White

City Company for a concession granted to it for the years 1905, 1906 and 1907. The items complained of as constituting this indebtedness consist of electric lighting and other expenditures used in operating the concession, amounting in all to approximately $4200. It is alleged that this sum is now due from the Chicago Fire Exhibition Company to the White City Company and that no effort has been made by the officers of the White City Company to collect the same. The Chicago Fire Exhibition Company was made one of the parties defendant to this bill, and the decree finds that amount should be accounted for by that company to the White City Company, with interest at five per cent per annum from October 15, 1907. No appeal has been perfected by that company from the decree. It is therefore final and conclusive against it. The item therefore requires no further consideration from this court at this time.

By his bill filed in the circuit court the plaintiff in error asks that he be reimbursed, out of the funds recovered, for the amount of expenses necessarily incurred by him in and about the prosecution of this suit. The trial court found that in and about the investigation of the matters complained of in his bill and the prosecution of this suit the complainant was compelled to expend and incur liabilities for large sums of money for attorneys' fees, stenographers and expert accountants; that this was a proper and necessary service in and about the investigation of the matters complained of and the prosecution of the suit, and that in equity those sums should be made a first lien and charge upon the funds recovered and saved to the White City Company by reason of this suit, and decreed that such expenditures should be a lien upon any and all sums of money recovered in this proceeding, and it referred this matter, among others, to the master to take the evidence and report the same, with his conclusions as to the amount of such expenditures.

275 – 40

The White City Company, although a party defendant to the bill and the one for whose benefit this action was brought, took no active part in the investigation of these matters or in the prosecution of this suit, neither did it prosecute an appeal from the decree of the lower court or assign cross-errors in the Appellate Court or in any way question the propriety of the decree of the lower court; neither does the correctness of the allowance of these charges seem to have been directly raised by any specific assignment of error in the Appellate Court or to have been raised and specifically pointed out in the brief and argument filed on behalf of Joseph Beifeld as one of the errors relied upon for a reversal of the decree in that court. However, it does seem from the majority opinion of the Appellate Court that this item was referred to in the oral arguments in that court, but whether by counsel for Joseph Beifeld and the hotel company or by counsel for the White City Company the record does not show. No brief and argument appear to have been filed in that court by anyone for the White City Company.

The course pursued in the lower court was for each party to file exceptions to that part of the decree of which he complained. The White City Company filed no exceptions to any portion of the decree as entered. The defendants in error Joseph Beifeld and the hotel company filed joint exceptions,—forty-six in all,—in the twenty-seventh of which they took exception to that part of the decree which finds that plaintiff in error has incurred liabilities for large sums of money in and about the prosecution of this suit and decrees the same a proper charge on the fund recovered by the White City Company in this suit. The errors assigned which are claimed to have raised this question in the Appellate Court are the second of the joint errors assigned by Joseph Beifeld and the hotel company in that court, as follows: "The court erred in not sustaining the exceptions, and each of them, had and taken by

appellants to said decree of October 16, 1913, and the findings therein, and which said exceptions are appended to and made a part of this decree;" and the tenth, eleventh, twelfth and thirteenth, to the effect that the decree is contrary to the law and the evidence.

Plaintiff in error insists that as no appeal was prosecuted by the White City Company and the allowance of such item specifically pointed out by it in the Appellate Court as error, the matter was not properly before the Appellate Court for decision on this appeal even if the joint assignment of errors of Beifeld and the hotel company was broad enough to raise this question. The reason urged is, that neither Joseph Beifeld nor the hotel company was in a position to assign error as to the allowance of such item in behalf of the White City Company; also that the item, even if covered by such assignment of errors, was waived in that court by the failure to argue the same in the printed briefs and arguments filed in that court by the defendants in error. On motion of the plaintiff in error certified copies of the briefs and arguments of the parties filed in the Appellate Court have been filed in this court. Plaintiff in error further contends that, independently of the question of the sufficiency of the assignment of errors, the item was properly charged against the trust fund and allowed to him under the general equity powers of a court of chancery. Defendant in error Joseph Beifeld insists that the above assignment of errors by him jointly with the hotel company is sufficient to raise this question; that it is both joint and several, and that his interest in the corporation as a stockholder is sufficient to allow him to assign errors in its behalf; also that such expenses are not properly allowable out of the funds recovered under the laws of this State.

Ordinarily only the party whose rights are injuriously affected by the judgment or decree appealed from can assign error as to that part of the judgment or decree. (*Press v. Woodley*, 160 Ill. 433.) Defendants in error do not dis-

pute this general proposition, but insist that Joseph Beifeld, as owner of a majority of the capital stock of the White City Company, can assign errors in its behalf, as he was a party to the proceedings and the decree adversely affects his interests as such stockholder. While in some cases the court has allowed a stockholder whose rights as such are adversely affected by a decree against a corporation in which he is interested to assign error as to that part of the decree, (*Kavanagh* v. *Bank of America,* 239 Ill. 404,) those cases are an exception to the general rule. The reason which allowed such course loses much of its force in the present case when it is considered that Joseph Beifeld is president of and in control of the White City Company and has been since its organization, and apparently has controlled and dominated its actions throughout the whole course of this litigation. Under such circumstances it was neither necessary nor proper for him to assign errors in its behalf, and the White City Company not having appealed and the question as to the allowance of the item complained of not having been raised or argued in the briefs filed in the Appellate Court, such question should not have been considered by the Appellate Court and will not be considered by this court.

Complaint is also made because the court taxed the costs of the proceeding to the defendants in error Joseph Beifeld and the hotel company. The allowance of costs in a chancery case rests very largely in the discretion of the chancellor. It will only be interfered with in cases of abuse in the exercise of such discretion. We think from an examination of the record in this case that the action of the chancellor in this respect was proper, and it is accordingly approved.

For the reasons given, the judgment of the Appellate Court and the decree of the circuit court of Cook county will be reversed and the cause remanded to the circuit court for further proceedings in accordance with the views herein expressed.                    *Reversed and remanded.*

Mr. JUSTICE COOKE, dissenting:

By the contract between the hotel company and the White City Company the hotel company was granted the exclusive right to sell all foods, drinks, cigars, cigarettes and tobaccos within the premises leased by the White City Company and during the term of such lease. It was contemplated originally that the hotel company should carry on this business in the College Inn building. I can perceive no reason, however, why the White City Company should not grant the hotel company, under this concession, the right to sell these articles to the patrons of the White City Company elsewhere than in the College Inn building. The purpose of granting this concession was to afford the patrons of this amusement park an opportunity to be served with meals and luncheons. If the College Inn should prove inadequate for that purpose, it would appear to be as much to the advantage of the White City Company as to the hotel company to provide more ample facilities for catering to the wants of the people patronizing the park. The White City Company by resolution permitted the establishment of a lunch room, and in my judgment it had the right to do this upon the same terms that the hotel company was permitted to carry on its business under its concession in the College Inn building.

I do not concur, therefore, in the conclusion reached in reference to the sale of food elsewhere than in the College Inn building. In all other respects I concur with the conclusions of the majority.

Mr. JUSTICE DUNN: I concur in the dissenting opinion of Mr. Justice Cooke.