# City of Chicago, Appellant, v. Chicago City Railway Company, Appellee.

## Gen. No. 31,479.

1.  STREET RAILWAYS—*deductions of Federal taxes from gross revenue in fixing amount of revenue payable to city.* The actual or constructive knowledge of designated officers or agents of a city of the books and accounts of a street railway company disclosing deductions of large sums of money for Federal income and excise taxes from the gross revenue, in ascertaining in a long series of years the annual amount of net revenue upon which the company is required by a unification ordinance and agreement annually to pay a percentage thereof to the city, and the acquiescence therein of said officers or agents, must be deemed knowledge and acquiescence on the part of the city, and a contemporaneous and practical construction of the right to treat such taxes as deductible items as being included within the provision allowing deduction of ''taxes and assessments levied and imposed on the real and personal property of the companies including all capital stock or franchise taxes.''

2.  CONTRACTS—*practical construction by the parties.* A practical construction given to a contract by the parties thereto is entitled to great, if not controlling, weight in determining its proper interpretation.

3.  ACCOUNTS STATED—*yearly settlement statements of payments to city under unification agreement as stated accounts.* Under a unification ordinance and agreement for a street railway company annually to pay a percentage of its net revenue to the city, as determined by deducting, among other items, ''taxes and assessments levied and imposed on the real and personal property of the companies including all capital stock or franchise taxes,'' yearly settlement statements in which Federal income and excise taxes are treated as proper deductions are stated accounts binding upon the city, where the annual statements are made under the contractual arrangement whereof their accuracy is to be determined through agencies in which the city is expressly represented, and whereby the statements are not accepted until so audited and approved, and which are accepted through a long series of years without objections until suit is begun by the city disputing the deduction of the Federal taxes.

4.  INTERNAL REVENUE—*Federal excise tax as a capital stock tax.* The Federal excise tax provided for in the Revenue Act of September 9, 1916, and in subsequent acts, is based on a fair average value of the corporation's capital stock, and is officially and otherwise referred to as a capital stock tax, although, strictly speaking, a capital stock tax is a tax on the property of the corporation and not on the shares.

5. TAXATION—*nature of franchise tax.* The State corporation franchise tax is not a tax on the property of a corporation but, properly speaking, is imposed on the corporation for the privilege of carrying on its business and exercising the corporate franchise granted by the State.

6. INTERNAL REVENUE—*nature of Federal excise taxes.* Federal excise taxes are analogous to and often referred to as of the same nature and character as the State corporation franchise tax.

7. STREET RAILWAYS—*deduction of Federal excise tax from gross revenue in fixing amount payable to city.* The Federal excise tax paid by a street railway company under the Revenue Act of September 9, 1916, and in subsequent years, held to be in its nature such a tax as was contemplated to be a deductible item under the ordinance and operating agreement of a unified street railway with a city, in which a percentage of net revenue is annually paid as ascertained by deducting from the gross revenue, among other items, sundry taxes ''including all capital stock or franchise taxes,'' irrespective of whether the Federal excise tax is called a specific excise tax or a franchise tax.

8. STREET RAILWAYS—*deduction of Federal income tax from gross revenue in fixing amount payable to city.* The Federal income tax of a street railway company, being a tax upon property, is within the language of ''taxes upon the real and personal property of the companies,'' authorized by a unification ordinance and agreement to be deducted from the annual gross revenue in ascertaining the net revenue of which a percentage is to be paid by the company to the city.

9. TENDER—*right of creditor to interest on refused tender.* The fact that, after a city refused to accept the money tendered by a street railway company in payment of a percentage of its annual net revenue as provided by a unification ordinance and agreement, the company deposited the money in a bank and received interest thereon until the sums were accepted by the city, does not entitle the city to receive interest on the tendered money between the dates of refusal and acceptance.

10. TENDER—*right of debtor to use tendered money that is refused.* The ownership of money tendered to but refused by the creditor remains in the debtor with the right to its use, provided the debtor continues to keep the tender good by being always ready, willing and able to tender the debt.

11. TENDER—*keeping of identical money in keeping tender good.* In order to keep good a tender of money which is refused it is not necessary to keep the identical money at all times ready to make good the tender.

Appeal by plaintiff from the Municipal Court of Chicago; the Hon. CHARLES F. MCKINLEY, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1926. Affirmed. Opinion filed October 4, 1927.

FRANCIS X. BUSCH, Corporation Counsel, C. M. DOTY, Assistant Corporation Counsel, and WILLIAM H. HOLLY, Special Assistant Corporation Counsel, for appellant.

HARRY P. WEBER, for appellee.

MR. PRESIDING JUSTICE BARNES delivered the opinion of the court.

This is an appeal from a judgment dismissing the suit and for costs against plaintiff on striking of plaintiff's statement of claim, as finally amended, and is consolidated with an appeal from like action in case No. 31480, *City of Chicago v. Chicago Rys. Co., post,* each presenting on like facts the question whether the stricken pleading states a cause of action.

The city seeks to recover $1,034,273.01 in this action, and $1,304,323.72 in the other. What is said herein will be applicable to both.

Each suit is.based on various ordinances of the City of Chicago pertaining to franchises granted to said companies—and other companies embraced in the system of one of them, unnecessary to mention—for operating street railways, and an "operating agreement" entered into between the companies for the unification of their systems as required by one of said ordinances, which are set forth in the statement of claim.

It will not be necessary to state their various provisions, the principal one involved, over which the main controversy arises, being that which requires each of said companies to pay annually to the city 55 per cent of its "net income" to be ascertained by deducting from the gross income all operating expenses (including maintenance, repairs and renewals and amounts paid out by way of damages for injuries to persons and property), all amounts paid out for "taxes and assessments levied and imposed on the real

and personal property of the companies *including all capital stock or franchise taxes,"* also an amount equivalent to 5 per centum of the cash purchase price the city would be obligated to pay, and certain other items of expense. Only the quoted provision calls for construction, particularly the phrase we have italicised.

The statement of claim is predicated on two contentions: (1) That in computing the amount due the city each year appellee improperly deducted Federal income and excise taxes; and (2) that the city is entitled to interest on amounts tendered by the companies but refused by the city in each of the years 1920, 1921, 1922 and 1923 when due, from the times of such tenders to October 20, 1923, when having abandoned its claim of forfeiture of franchises on which it based such refusals, the city accepted the sums tendered subject to verification as to amount and to any claim for interest on the same the city might have.

Under the first contention counsel for the city urge that neither the quoted language in question, nor any of the terms of the ordinances or agreement, authorized the deduction of Federal income and excise taxes, and that the Federal income tax is not a tax on real or personal property; that the Federal excise tax is not a franchise or capital stock tax, and that neither is included in the words "operating expenses." On each of these contentions appellee takes issue, and in addition urges that in treating Federal taxes as deductible items for nearly 17 years both parties have given contemporaneous and practical construction to the provisions in question, and the city is barred from asserting such claim on principles of estoppel and stated account.

From the statement of claim it appears that said companies have been operating continuously under original ordinances passed in 1907-8-9, and later ordinances, one of which authorizes unified operation

of the city's surface traction lines by a board of operation, under the designation "Chicago Surface Lines," in accordance with a prescribed form of agreement which was subsequently entered into between the companies and the city.

Said agreement after setting up the deductible items in accordance with the ordinances and fixing a basis of division of the "residue receipts" between the companies, requires said board of operation to make and file with the city comptroller an annual report on or before April 10 of each year for the preceding year ending January 31, in detailed form as prescribed by the city comptroller, of the business done by the companies, and the amounts of receipts and expenses from operation. These reports were so made and filed yearly from 1916 to 1925, inclusive, setting forth in itemized form the earnings, expenses and division of residue receipts of the surface lines for the previous fiscal year.

Included in the classification of expenses, as shown in said reports, were items designated as "taxes" or "general taxes" paid by the companies, which included the Federal excise and income taxes paid by the companies respectively for those years. Said books and accounts were kept in the form prescribed as required by a board of supervising engineers representing the city and said companies, approved by the city comptroller, and examined and audited by certified book accountants selected jointly by the city and said board of operation, and a report of the audit was filed with and approved by the comptroller yearly except for the years 1920 to 1923, inclusive, the period the city claimed a forfeiture of the franchises. But in July, 1924, after the city abandoned that claim the books and accounts for those years were audited in the same way as before that time. Provision was made for complete access to said books and accounts by the city to determine their accuracy, and each year, except

as aforesaid, it accepted its share of the "net" or "residue receipts" as thus shown and verified, apparently without protest or question of the right to deduct said Federal taxes until it filed its amended statement of claim.

While the statement of claim avers that the city was not informed and did not know of the deductions of said Federal taxes until August, 1925, the averment is inconsistent with the knowledge it necessarily acquired prior to that time through the examinations and audits thus made by its designated officers or agents. Their actual or constructive knowledge of the books and accounts which disclosed such deductions aggregating hundreds of thousands of dollars, and their acquiescence therein must be deemed knowledge and acquiescence on the part of the city, and a contemporaneous and practical construction of the right to treat such taxes as deductible items.

While the statement of claim omits to refer to the Federal taxes levied prior to the year 1916, probably because of the running of the statute of limitations, it will be taken most strongly against the pleader, under well-recognized principles of pleading, that the Federal taxes for the prior years were also treated and acquiesced in as deductible items. As frequently held such practical construction given to the contract by the parties thereto is entitled to great, if not controlling, weight in determining its proper interpretation. (*Merle v. Beifeld,* 275 Ill. 594, 620; *Gillett v. Teel,* 272 Ill. 106, 114; 13 C. J. 546; 4 Page on Contracts, § 2014; *Chicago v. Sheldon,* 9 Wall. (U. S.) 50; *City of New York v. New York City R. Co.,* 193 N. Y. 543, 548.)

Besides, these yearly settlement statements having been made under contractual arrangements whereby their accuracy was to be determined through agencies in which the city was expressly represented and whereby they were not to be accepted until so audited

and approved, and having been accepted through a long series of years without objection until after this suit was begun, we think under the reasoning of the Supreme Court in *State v. Illinois Cent. R. Co.*, 246 Ill. 188, 246, 249, they were stated accounts by which the city was bound. The facts of this case, as above recited, supporting such conclusion, are more persuasive than those in the cited case, for, while in that case knowledge on the part of the State was implied from the duty imposed upon the governor to examine the submitted accounts of the railroad and the presumption of the performance of that duty (though expressly challenged), here the accounts were admittedly examined and approved by authorized agents of the city pursuant to contract requiring them to determine their accuracy before making the yearly settlements.

With these conclusions we might perhaps dispense with consideration of the real nature of the Federal taxes so deducted, although counsel have devoted over 350 pages of their briefs to a critical analysis and discussion of many cases in various jurisdictions, Federal and State, touching this subject. To follow them into the intricacies of the subject and into their various distinctions would extend this opinion beyond reasonable limits.

The subject has arisen under various forms for interpretation and elucidation, and much space has been devoted to its discussion. We can only undertake to refer generally to conclusions without noting the specific facts on which they were based or discussing the nice distinctions they involve.

The first time the question could arise under the Settlement Ordinances was when in 1909 Congress imposed upon every corporation "a special excise tax" of 1 per cent of its net income over and above $5,000. In 1913 this law was repealed and an income tax imposed in lieu thereof. The Revenue Act of September 9, 1916, restored the excise tax and provided

that on and after January 1, 1917, every corporation organized for profit and having capital stock represented by shares "shall pay annually a special excise tax with respect to the carrying on or doing business by such corporation." (Title IV, Miscellaneous Taxes, 407.) This tax was increased in 1918 and continued until changed in 1924 to apply to "every domestic corporation."

The Federal income tax has been imposed on corporations in varying amounts since October, 1913.

The excise tax provided for in the 1916 and subsequent acts is based on a fair, average value of the corporation's capital stock, and is officially and otherwise frequently referred to as a capital stock tax. Strictly speaking, a capital stock tax is a tax on the property of the corporation and not on the shares of stock. (*Illinois Cent. R. Co. v. Carr*, 302 Ill. 172, 179.) A franchise tax is not a tax on the property of the corporation but, properly speaking, is imposed on the corporation for the privilege of carrying on its business and exercising the corporate franchise granted by the State (37 Cyc. 817; Beale on Foreign Corporations, p. 663; *Maine v. Grand Trunk Ry. Co. of Canada*, 142 U. S. 217; *State v. Clement Nat. Bank*, 84 Vt. 167, 78 Atl. 944; *State ex rel. Marquette Hotel Inv. Co. v. State Tax Commission*, 282 Mo. 213, 221 S. W. 721; *Tremont & Suffolk Mills v. City of Lowell*, 178 Mass. 469, 59 N. E. 1007; *People ex rel. United States Aluminum Printing Plate Co. v. Knight*, 174 N. Y. 475, 63 L. R. A. 87; *City of Newark v. Tunis*, 81 N. J. L. 45), and Federal excise taxes are analogous to and often referred to as of the same nature and character as the State corporation franchise tax. (*American Can Co. v. Emmerson*, 288 Ill. 289.)

Discussing the nature of the Corporation Tax Law of 1909, designated therein as a special excise tax, the court in *Flint v. Stone Tracy Co.*, 220 U. S. 108, said: "The intention is expressly declared to impose

a special excise tax with respect to the carrying on or doing business by such corporation, * * * it is a tax upon the doing of business with the advantages which inhere in the peculiarities, of corporate or joint stock organization. * * *'' (p. 145). And again on page 162: `` * * * the tax is laid upon the privileges which exist in conducting business with the advantages which inhere in the corporate capacity of those taxed, * * *. It is this distinctive privilege which is the subject of taxation.'' It seems to be immaterial, therefore, what designation is given to the Federal excise tax, whether it be called a specific excise tax or a franchise tax, as it is in its nature such a tax as was evidently contemplated to be a deductible item under the ordinances and operating agreement.

But the Federal income tax, being a tax upon property, comes within the language of ''taxes upon the real and personal property of the companies,'' authorized to be included among deductible items. Holding that the proposed tax on incomes derived from intangible personal property is a tax on property, it was said in *In re Opinion of the Justices,* 220 Mass. 613, 108 N. E. 570: ''A tax upon the income of property is in reality a tax upon the property itself. * * * It does not matter what name is employed. The character of the tax cannot be changed by calling it an excise and not a property tax. In its essence a tax upon income derived from property is a tax upon the property.'' (p. 624.) There was a like ruling in *State v. Pinder,* 30 Del. 416, 108 Atl. 43; *Lining v. Charleston City Council,* 1 McCord (S. C.) 345, and *Eliasberg Bros. Mercantile Co. v. Grimes,* 204 Ala. 492, 86 So. 56. The last-named case repudiates a reasoning somewhat different in the main authorities cited and relied on by appellant. We shall not undertake to distinguish them.

Reaching the conclusion we have we shall not discuss whether or not the Federal income and excise taxes are deductible as "expenses of operation," as contended by appellee. While there is plausibility in the contention in view of certain language employed in various parts of the ordinances and operating agreement, we deem it unnecessary to discuss it.

The city bases its claim to interest on the amounts so tendered, first, because such amounts were not the full amounts due the city; and, second, because after the refusal of the city to accept the amounts tendered the companies, as alleged in the statement of claim, deposited said moneys in certain banks and received interest thereon until the sums were accepted by the city October 20, 1923. The interest so claimed in the two suits amounts to $794,372.91. In view of our holding that the Federal taxes were properly deductible items, it is not necessary to discuss the first contention, and the second ground we think is untenable. From the allegations that the tendered money was kept on interest in certain banks, the tender was kept good. By the great weight of authority it is laid down generally as an established principle that while a refused tender does not discharge the debt the ownership of the money tendered remains in the debtor with the right to its use, provided the debtor continues to keep the tender good by being always ready, willing and able to tender the debt. (*Stowell v. Read,* 16 N. H. 20; *Terrell v. Walker,* 65 N. C. 91; *Curtiss v. Greenbanks,* 24 Vt. 536; *Colby v. Stevens,* 38 N. H. 191; *Birmingham Paint & Roofing Co. v. Crampton & Tharpe* (Ala.), 39 So. 1020; *Woodruff v. Trapnell,* 12 Ark. 640; Am. & Eng. Ency of Law [2d Ed.], vol. 28, pp. 14, 40; Lawson on Rights, Remedies and Practice [1890], vol. 5, p. 4181; 26 R. C. L. 649; 38 Cyc. pp. 162-3; Page on Contracts, vol. 5, p. 79.)

And keeping the tender good does not require keeping the identical money at all times ready to make

good the tender; for "the debtor may use it as his own without destroying the effect of the tender, if he is ready at all times to pay the debt in current money when requested. But if by making use of the money he is not ready to pay the debt at any time when he may be required to do so, the effect of the tender is destroyed." (28 Am. & Eng. Ency. of Law, *supra*, p. 40.) The averment that the money was kept on interest does not, however, indicate that it was used.

And this principle is in accord with the rules of pleading. The plea of tender "is a material averment to which the plaintiff may reply a subsequent demand and refusal; and this, if established by proof, will avoid the tender. It is therefore unnecessary that the person making the tender should always hold himself in readiness to meet a demand for the money or thing tendered. * * * But this principle * * * does not impose upon the person making the tender the duty of having the money about his person or in his actual possession at all times and in all places. It would be sufficient to have it in readiness, * * * if a large sum, in some safe and convenient place of deposit." (*Town v. Trow*, 41 Mass. 169; 2 Chitty on Contracts [7th Am. Ed.], p. 1197.)

We concur in what is said in *Woodruff v. Trapnall*, 12 Ark. 640: "It may safely be assumed upon principle that a legal tender always stops interest and costs, because where the party who contracts to pay, or is adjudged to pay, offers and tenders that which his obligation or the judgment of the court under the law requires of him, he is no longer in default, and cannot be taxed with either interests or costs, for these only arise in consequence of default." While there may be found expressions in *Aulger v. Clay*, 109 Ill. 487, and *Rankin v. Rankin*, 216 Ill. 132, supporting appellant's contention as to the right to interest, we think it apparent that the cases were decided on another principle, namely, the right to interest on the

purchase price of land where the purchaser has taken and retained possession of it. Later decisions of the Supreme Court in *Glos v. Ambler,* 218 Ill. 269, and *Thompson v. Crains,* 294 Ill. 270, seem to be in accord with the doctrine above stated. Under the alleged facts, therefore, we must reach the conclusion that the tenders having been properly made and kept good, there was no liability for interest on the moneys tendered. As said in *Allen v. Woodruff,* 96 Ill. 11: "It is a *well* settled rule, recognized alike by courts of law and equity, that a tender properly made and kept good is a complete answer to any claim for interest."

Accordingly the judgment is affirmed.

*Affirmed.*

GRIDLEY and WELLS, JJ., concur.